Case number 241336, Don Hayes v. Clariant Plastics and Coating. Oral argument not to exceed 15 minutes per side. Mr. Nichols, you may proceed for the appellant. Thank you and good morning, Your Honors. Matthew Nichols appearing on behalf of the plaintiff appellant, Don Hayes. I'm joined today by my colleague and co-counsel, Christopher Cook, as well as my client, Ms. Hayes, who's in the gallery today as well. I would like to reserve the audience for rebuttal time. Your Honors, this is a Title VII case involving claims of age and gender discrimination, as well as a hostile work environment claim, Equal Pay Act, and Elliott Larson's civil rights claim. We are asking this court to reverse the district court judge's grant of summary judgment in favor of the defendant, which was based on a failure to state a prima facie case, finding no similarly situated comparators were at defendant's warehouse when compared to plaintiff. That result is precisely what this court in Ercegovich v. Goodyear, Martin v. Toledo Cardiology Consultants, and Jackson v. VHS Detroit Receiving Hospital cautioned against when analyzing the fourth element of a circumstantial evidence discrimination case. And in those cases, the panels cautioned that the burden at this stage, at the prima facie stage, with respect to the fourth element and the similarly situated test, is not to be onerous. We know that in order to establish a similarly situated, there must be three things that must be shown. First, that the plaintiff and the comparators have dealt with the same supervisor. They were subject to the same standards, and engaged in the same conduct. In Ercegovich, this court further highlighted that a plaintiff doesn't need to demonstrate an exact correlation. So I assume, I agree with you on that. You still admit you have to show that there are legitimate non-discriminatory reasons of potential, right? Right. They came forward with, they balanced the relevant employees, and they found that your client was the one going forward, who would be the least productive. So why was that pretextual? Well, I'll jump right to the pretext argument, which was my second. And at this stage, all the plaintiff had to do was bring in credible evidence to show that the offered reason had no basis in fact, didn't motivate the decision, or was insufficient to motivate that decision. We acknowledge, as brother councils pointed out, that this is a workforce reduction case, and that there's, I'm sorry. That there's an additional heightened burden to show a direct circumstantial or statistical evidence that plaintiff was singled out. Based on the lower court record and the record submitted to this court, we believe that we have shown that there were sufficient facts in dispute that showed that the decision- But are the facts in dispute that the other employees did have some skill sets that your client lacked? It seems that's somewhat understated. Well, no, Judge. I think that kind of backtracks back to the similarly situated analysis. Which I think the court should look at this not as though this warehouse and these employees are being put under a microscope. I think the court's, the proper analysis is to look at, what are the relevant aspects of their job? And I'm not asking this panel to look at it at the most broadest scale possible. But I think within reason, we can establish that, look, these employees were warehouse employees. They were non-skilled tradesmen or tradeswomen. They moved product from one point to another, made sure that that product made it into the proper packaging with the proper label, and it was shipped to the proper place. And the incoming materials were likewise properly received. That was the right material, and it got put in the right place. So this whole thing about superior skill set really was just, I think, an artificial distinction that the defendant created. And to further highlight that- Why can a reasonable jury believe that? I mean, that's the question. I mean, I think maybe we're talking about the forklift here, right? The forklift license is the relevant skill set at issue, is that- Well, there was a general argument that the defendant made that Mr. Pergesi had a superior skill set. But if you look at the testimony as to what Plaintiff and Mr. Pergesi did, they both testified nearly identical. That they were primarily dealing with moving products, dealing with shipping and printing FedEx labels. And that the forklift only came about like once a month. And with respect to Plaintiff, her non-use of the forklift, she had a license at one point. That's not in dispute. What's also not in dispute is that she suffered no adverse consequence for letting that license lapse or not using a forklift. She was never asked to use a forklift. Had she been asked to use a forklift, we submit that she probably would have said yes, and she would have gotten her license back. But that license requirement wasn't based on federal or state law or OSHA. It was an artificial requirement by the defendants. And now they're using that to say, well, they're not similarly situated because of a forklift. But in the grand scheme of things, these are warehouse employees. But isn't it, so for the position that they currently occupy, they might have been similar. But they weren't looking at it from that perspective because they were looking at it from the perspective of the reduction. And so you're asking, who would have, aside from the current position, who would have the best skill sets moving forward? And they did come forward, not just with the forklift, but, I'm sorry, I can't pronounce that as a perjessi. Perjessi had management skills. Yes, he had been demoted, but he did have some management skills. And apparently, he had worked in production. And these were things that your client did not possess. Well, I think the operative question there is, that's the question. Why is that relevant to his current position, that he was moved to after he was demoted from his management position? And what use was his failed managerial experience in regard to essentially doing the same tasks, printing and shipping labels and making sure things go from point A to point B? How is that relevant to whether or not the plaintiff and Mr. Perjessi were doing the same thing on a relevancy basis? So what you're saying is, even after they reduced and went down to one position instead of two positions, right? So that having managerial experience just didn't matter whether there's two people in the office or one, that's your- Right, and we can look at it because who's the manager at the time? That's Brad Miller. Brad Miller wasn't terminated. And again, I think what we're getting at here is that there's clearly facts in dispute, and when the facts are in dispute, that should go to the jury. It shouldn't be the province of the trial court judge to weigh facts in dispute, determine credibility of the witnesses. That should be for the trier of fact. The cases I cited in my opening pretty much go over, that is the traditional province of the trial court versus the jury on motion for summary judgment. But with pretext and this additional evidence to show that she was singled out. It is there, and we can look right to the timeline of events as to what happened. That starts in February of 2018 when emails between Bob Anderson and Aaron Zenos are exchanged. Plaintiff appears on a list of persons subject for involuntary termination. She's the only person on that list in the Albion Warehouse. In those discussions, they note that Dawn has seniority over Mr. Pergesi. So do we need to make this about performance or skill issue? Or not, because they have different titles. So from there, and from there, they concoct the rating sheet as a means to justify the events. We're gonna create this rating sheet, we'll document her poor performance. I'm paraphrasing, I'm not quoting anybody. But Anderson, from Mr. Thomas' deposition, he testified that Anderson told him, hey, the feedback I've gotten on Dawn, she's not all the way up on SAP, so start there. So she's already looked at in a negative light on Joe Thomas' rating sheet. He didn't receive or testify to any similar negative comments made by Mr. Anderson to any of the other warehouse employees. Furthermore- Do you think it is a, I thought that was one of the bases, though, was the software update and your clients- That's what they claim, Judge, and that's a good point, because- What's the evidence that suggests she was fully able to perform that, to use that software? Well, it's two things. There's the evidence and the lack of evidence. And then I'll talk about the evidence that defendants rely on. So the evidence, we can look to Brad Miller's, what we call, we're calling them the objective performance evaluations, because he was not involved in the discussions between Anderson and Zenos and Toma. In which he said Dawn, he basically rated her second highest out of the group of five. He noted that she was proficient in the SAP system, though he noted there were some things that she needed help on, but he followed that comment with, as we all do. Meaning that she is not the only one that may be experiencing some sort of lag in learning a new system that was just rolled out within under a year. I think, so that's the evidence that we have. Now, the lack of evidence is the fact that there is no other piece of the record within the plaintiff's employee file or otherwise, showing that she lacked the necessary skill set, knowledge, or proficiency with the SAP system. And this goes to defendant's evidence. What is it? It's predominantly hearsay. It's Anderson telling Toma, I heard Dawn is struggling with SAP. It's comments from Anderson and others that we heard through other people at the Chicago trainings session that she was struggling with the training. She expressed quarrels with it, but that's all hearsay. So you're saying they can't use that? Right, it shouldn't have been considered for summary judgment. I see my time's limited. Your time is about up, so I want to ask you one thing you didn't talk about. Thank you, Judge. You didn't undertake something I would have thought you probably would have, which is a general comparison of Perducey and your client and their overall performance as an employee of the company. I'm sorry, what's the question? Well, there's some facts in the record that suggest positive things about your client and some not so positive ones about Mr. Perducey. I thought you would have focused on that, but you must not think that's a strong point because you had talked about it. Well, I understand with limited time, I know I've talked about some of that in the brief. Judge, I see my time is up. You can answer. Sure. So the negative comments on Mr. Perducey, I think those are clear. Those were within the record. They were discussed in our brief. Again, I don't think the highlight should be he's bad, she's good. The point that we were trying to get across was... If she's the better employee overall in terms of dependability and skills overall and he's a problem, then you start looking for reasons other than performance, arguably, to support her termination. Right, and we argued in the brief that that was Bob Anderson saving Mr. Perducey's job and Bob was an example of him being treated much more favorable than Don when that was not extended to Don. My time is up. I shouldn't have waited until the last minute to ask that question either. It's okay, Your Honor. If you'd like to briefly conclude. With that, I wasn't able to touch on the other issues, the hostile work environment claim, which I think is the severe instances that she went through. I think it's worth noting that the district court shouldn't have dismissed it on the merits. With that, I will rest on my briefs. Of course, we ask this court reverse and remand for further proceedings. Thank you, Your Honors. Good morning, Your Honors. Josh Lush on behalf of the Appellate Executive. I think just getting right into the issue that everyone was talking about, the key issue in this case is the similarly situated standard. And the case law is clear. Both parties have quoted accurate case law that to be similarly situated, employees need to be nearly identical in all relevant aspects. The question becomes context. What is a relevant aspect? In misconduct cases, for example, it's whether or not the employee is engaged in comparably serious underlying conduct to warrant different treatment. In other situations, for applicants, it looks at skills. It looks at qualifications to see if they're similarly situated. In this case, the relevant context is skills. This was a workforce reduction. Clare Hanger was analyzing not what everyone did, but what everyone had the skills to do in the future as they were leaning up the organization. So it's important that the similarly situated analysis and what the relevant aspects are are into context. Now plaintiff makes a lot out of saying that it should have looked at the performance review. Performance review is how they're doing their actual job at the moment, their limited duties. It's undisputed in the record that Ms. Hayes herself lost the SAP role of corker in April of 2017. She was unable to perform it. Instead of terminating her employment, she was given a different position or a modified position in the warehouse. So this goes to the pretext that to the extent that they're saying Mr. Pergesi was saved and Ms. Hayes was not, that's not true. So I understood your point about it's not about their current position. It's about their skills going forward. But there was going to be one person who was terminated between the two of them. But it seems like they were performing the exact same job by March. So why did those additional skills matter? Because they wouldn't need them for the job that would be retained. Well, that's not totally accurate, needing them for the job that would be retained. Okay, that's what I was curious about. Yeah, the where. Was it going to transform into a new job that required additional skills or? Well, in essence, so you have a small department of five individuals with a supervisor. Three of them spend most of their days on a forklift running around moving material all day. The other two are spending time in the office doing different duties, by the way. It's also undisputed in the record that over the years, because of her lack of SAP expertise, Ms. Hayes' duties were essentially reduced to printing shipping labels, clicking and releasing orders in the system, and physically walking down and getting a sample chip of coloring, because that's what they do at the plant, and putting it in an envelope to accompany the shipment. So even if you look at duties, what they were doing was not equal. Bear in mind, Mr. Pergesi's position of warehouse coordinator was created because of Ms. Hayes' shortfalls with SAP. So he was doing more SAP functions than her at a higher level. Now, to your original question, my apologies. Going from five individuals to four individuals, it's a leaner organization. If somebody misses, people need to be cross-trained. So the testimony is clear that Mr. Thoma looked at, with the rating sheet, the skills of everyone and their utility moving forward. It's undisputed that an employee that is forklift certified, has been on a forklift, and has worked in management, and has production skills and can go over to production when they're short, has different skills, and is able to do further additional jobs. But with respect to the forklift, there's no reason to believe that Ms. Hayes couldn't get the forklift license again. She had it. It wasn't required for her job. There's nothing in the record to suggest if you asked her to get one, she couldn't get one. The issue is not what could have been done. The issue is what was done and why was it done, right? Because we're looking at whether or not there was animus in the decision. But do you think that that could create an inference of pretext, the notion that this seems like a technicality that you could easily fix? So to rely on that as a grounds for picking on, for Jay Z over her? No, I don't. Because the fact of having a forklift license, or having someone that's been on a forklift frequently and used it before, are two separate skills. The test to get a forklift license was- But he used it once a month, right? That's their position on it. He used it as needed. I believe there's testimony that if it was once a month for a whole day, he also would go out there and jump on it as needed. So, and I don't think that it creates an inference when it's what could have been done. And that wasn't the only reason. It wasn't just the lack of forklift skills. It was the substandard SAP skills. It was the reduced duties that she was doing. It was the lack of production cross-training. And it was the lack of supervisor experience. What's the evidence that her skills on the software were more deficient than others? Your friend on the other side suggested that was essentially hearsay. That wouldn't have been the evidence. Yeah. The, I mean, the testimony is in what she was actually doing. She, I mean, it's two parts. One, Mr. Vergesi's job, it's undisputed, was created almost a year prior because her SAP skills were lacking. Because she couldn't do what needed to be done in SAP. So, her duties were then greatly reduced to releasing orders and printing labels as it relates to SAP. So, the performance review that they're relying on to say her skills are the same as everyone is evaluating, it's Brad Miller evaluating Ms. Hayes in what are her SAP duties, it's these two things. This is how she's performing in those. It's not what duties can she do whole scale. So, beyond that, you then have Joe Toma's observations in the rating sheet that speak to capabilities. You know, it seems to be that there's evidence in this record from which one could conclude that the employee did not make a very good decision when it did not retain Ms. Hayes and selected, elected to retain the male. The question that's hard here is whether there's enough evidence to draw inference that the reason was gender. And so, that's, but I mean, there's a fair amount of evidence that would suggest that a reasonable employer might have made a different decision than what was made. I'd politely have to disagree, Your Honor. The rating sheet is what was looked at. It's what skills do we have. What, which employees will we get the most. Selected the factors at which you looked and they didn't include what would seem to be relevant things like performance evaluations over time, attendance and factors like loyalty to the company in that regard. So, you, I mean, you discounted a bunch of factors, right? Unfortunately, loyalty to the company doesn't result in increased skills and productivity for the company. And to the extent that Ms. Hayes has argued. But isn't the performance review or whatever it was that Mr. Thoma did, rating, like isn't there some evidence in the record that that was sort of targeted? Like let's find the thing she's bad at and, you know, she's bad at the SIP or SAP or whatever it was, so let's start there? No. The testimony in the record is that, and bear in mind, Mr. Anderson is Mr. Thoma's supervisor. He sees, oversees multiple plans. He then actually was on site in the Albion facility as a manager for several months, so he's familiar with the facility. He testified that he directed everyone that was looking at making involuntary cuts, even outside of Albion, to start with the warehouse because he understood that to be, for lack of a better term, bloated area where maybe the company could lean on. So then looking at that, he then did make the comment, you know, he testified to that he understood she wasn't up on SAP. That may mean something if the only factor relied on was the rating sheet SAP skills and then everyone was ready. That's not the case. To say that other factors should have been relied on, what could the company have looked at, that's just second guessing the business judgment of the company, and that's impermissible for a jury or for a court. More importantly, beyond. I was just going to ask about, although Ms. Hayes' counsel didn't talk about it today, there's this argument about the timing of the emails that were sent with regard to when her severance agreement was finalized and when the rating sheet actually made it to the company. Do you want to address that? Sure. So to try and demonstrate pretext, which I'd also like to talk about, they have not met the additional bar in the workforce reduction of additional circumstantial, statistical, or direct evidence showing she was singled out for a protected reason. In any event, to your question, they attempted to show that it wasn't the real reason because the rating sheet was transmitted via email 29 minutes after the severance agreement. And I know there's two versions of the emails. One is where it shows that maybe it's two and a half hours. It's because Mr. Anderson was in a different time zone. If you look at the two that are being sent, it's about 29 minutes. But there's testimony in the record from Mr. Toma that the rating sheet was done prior to that email and that he had had discussions with Bob Anderson and Aaron Zenos up to that point. So there's nothing in the record to suggest that that email is the one and only time the results of the rating sheet were shared and therefore it couldn't have been the reason her severance agreement was put together. On the additional burden that Ms. Hayes needs to satisfy because this is a workforce reduction program, as they concede, she needs to step forward with admissible evidence that shows direct circumstantial or statistical evidence that she was singled out because of her gender in this case. She's not done so. The statistical evidence is insignificant due to the sample size. You need to have statistical evidence that shows a statistical disparity in what's expected. It's too small of a sample here. That's in the Thompson case. There is no direct comments indicating, there's no evidence anywhere, even if you believe the rating sheet was false, even if you believe that Mr. Anderson selected these individuals with his preliminary list, which by the way was wrong in some respects, there's no evidence that she was actually selected because of her gender. Do you think, on the direct evidence point, I recognize you have timeliness arguments with respect to the hostile work environment allegations, but do you think that any of those comments are at all relevant to who was singled out? I mean, there's sex-based harassment. Could that be, even if you can't have it as a stand-alone claim, like if this went to a jury, could that be introduced as evidence of kind of maybe animus against Donna Gingerbrenner? No, because all of the allegations of hostile work environment first predate March of 2017, which predates Mr. Thoma's arrival at the facility. Mr. Thoma and Mr. Anderson are the decision-makers here. The harassment was a prior supervisor, not a direct supervisor of Ms. Hayes, but a prior individual that retired in 2017, so there's no nexus that any of those comments that were made by that supervisor or by coworkers played any role in the decision ultimately made by Mr. Thoma and Mr. Anderson well over a year later. So I don't think there's any relevance. I don't think that that evidence would appropriately make it to a jury. On the circumstantial evidence, the Thompson case has held that there is circumstantial evidence meeting the burden when a plaintiff can demonstrate that they had superior qualifications to those that were retained. Here, Ms. Hayes has never alleged that she had superior qualifications. At best, she's alleged that she could have one day obtained similar qualifications, but she's never testified to having equal in the moment or better. So there's no circumstantial evidence that she was singled out because of her gender. This heightened burden is important because in workforce reduction programs, someone is always going to be selected, and it's not a violation of the law, even though it would demonstrate a basic prima facie case, to show that a competent employee inside of a protected class was selected when a competent employee outside of the class was retained. So that's why this extra additional burden, which Ms. Hayes never really addresses, is very important in this context. Now, we've already talked about looking beyond the prima facie case. If she can establish a prima facie case, which we think the trial court correctly found that she could not, if she can meet the additional heightened burden because it's a workforce reduction, she still has to show that it's pretext. There's no evidence in the record that she was treated any certain way because of her sex or age. In fact, I think the age claim, take care of that quickly, Mr. Duffy was the oldest warehouse employee. If age was the motivating factor, she wouldn't have been selected. Moreover, she testified that no one, no individual at Clarion harbored any animus towards her for her age or her gender. She thought that the company, the company did, but no individual did within the company. So that takes the decision makers, Toma and Anderson. There's no evidence at all that they acted on the basis of her age. To try to second- Can I ask another question? So the guy, I can't remember his name, but the one who was doing the harassing and he got transferred to a different department, so he wasn't-  Her direct supervisor. I don't remember the person. Brian Pierce, he retired. Pierce, Pierce, okay. Was he working under Anderson at the time and Anderson was tolerating this or how does that work? He was under Anderson, but not directly. So Mr. Anderson sits at the regional level. There was no plant manager. I believe there was an operations manager. Then there would have been Mr. Pierce. So it wasn't directly tolerated, but it wasn't known. It was never reported. I see I have a minute left. To substituting the judgment of what the company could have looked at, should have looked at, is just second-guessing business judgment, which is all Ms. Hayes is trying to do. On the hostile work environment claim, since you touched on that briefly, it's undisputed that the charge contained no allegations of harassment. This court in the Jones case has held that a disparate treatment charge does not include notice of harassment. There's no case law expanding it in the way that they've asked. The letter that was sent weeks after cannot expand the charge. It doesn't satisfy the purposes behind the administrative exhaustion, which is giving the EEOC a notice, chance to investigate, and putting the defendant on notice. Clarion never received the letter prior to this lawsuit until it could FOIA. Moreover, if the letter did expand it, the letter clearly states that the last act of harassment was March of 2017, which is well before the charge, more than 300 days before the charge fell. I see my time is up. We'd ask that the district court's decision is affirmed if the panel has no further questions. All right. Thank you. Thank you. All right. We'll hear a rebuttal. Good morning, Your Honors. Chris Cook, appearing on behalf of the plaintiff appellant, Dawn Hayes. I apologize for my left eye. This morning, I had some cataract surgery on Tuesday and apparently didn't go quite as planned. But I think it's important to be here nonetheless. It's not painful. And I apologize if it's a distraction. I want to address right away the questions that the panel had, particularly Judge Murphy's initial question about the rating sheet. And to Mr. Nichols, whether or not the rating sheet was a basis for the decision-making process. The rating sheet we have conclusively established was never in the hands of Erin Zenos, who was the human resources manager, before she sent the termination package, the severance package for Dawn Hayes, down to the Albion Warehouse. We have established that Dawn Hayes was on this termination list as early as February of 26, 2018. It's Anderson's list. Zenos and Anderson are talking about it. And Zenos is telling Anderson on February 28, Dawn Hayes, Chris Progessi has less seniority, so we may need to exhibit the skill performance issue with Dawn. Or was it really not necessary as Chris is in a different role as warehouse coordinator? So she is identifying a potential problem within their seniority situation. And they're going to create a document that covers their decision-making process. And Zenos is specifically telling Anderson, we need this skill performance rating sheet done on Dawn. And if you look at the email we've provided, and it's ECF 577 page ID 413, she talks about a number of employees that have a higher seniority, have different skill sets, what have you. But she wants these rating sheets created to cover the decision that's already been made. Did seniority matter at all? Was it like a union-based type thing where you had to lay off folks by seniority? Or have a reason for it? Or why would they just think that skills is the most important data set rather than seniority? Well, the clarion workforce reduction plan spelled out how were they going to reduce employees within the department. It could include seniority. Temps go first, less senior employees go next. And so they're violating their own internal policies by creating this rating sheet. And if you look at the transmission of the rating sheet, it comes down from a higher level to Anderson, to Zenos who gives it to Anderson. And then as far as the transmission of the rating sheet, that is ECF 9516 page ID 1452. Toma sends the rating sheet to Bob Anderson who is on the East Coast. And on May 7th of 2018 at 1.32 p.m., I have attached Brad's review of his team as well as my assessment of the team. It looks like Brad's reviews all came out to a B rating. And you show that he's included the four ratings done by Brad Miller on March 3rd that scored Dawn tied with the highest performer in the department, Brian Duffy, ahead of Pergesi, ahead of the other forklift operator in the department. And then Anderson says May 7th of 2018 at 4.32 p.m., he's on the East Coast, it's a one hour difference in time, 4.32. Bob Anderson says, am I looking at this wrong? I just see one set of reviews. That's what he's saying to Toma. Then it's, I'm sorry. Your red light is on.  Yeah, you got three minutes for rebuttal. So if you have a quick point you want to make and. Yeah, Dawn Hayes was clearly the better employee than Pergesi. This warehouse coordinator job was created because Pergesi was going to be fired. He was on a performance improvement plan. He was demoted from second shift supervisor and Anderson testified, and it's in our submissions to the court, Anderson testified, we created a warehouse coordinator job for Pergesi to save his job. They never posted it, which was a violation of their internal policy. They never gave Dawn Hayes a chance to bid on it. Dawn Hayes wasn't a supervisor because when she applied for the job Brad Miller got, some 15 years before, she was told she was not qualified. And she'd been in that department for five years, Miller was never near that department. So she never even got a job. Thank you, Mr. Cook. Thank you. All right, thank you to both sides for your very helpful arguments today. We appreciate them, and we'll get you an opinion in due course.